IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ERIC LANGHAM, | ) |
| Plaintiff, | ) |
| v. | ) 16-CV-4169 |
| DR. KUL SOOD and WEXFORD HEALTH SOURCES, INC., | ) |
| Defendants. | ) |

**OPINION**

**TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE**.

Plaintiff, proceeding pro se from his incarceration in Hill Correctional Center, pursues an Eighth Amendment claim for deliberate indifference to his folliculitis/pseudofolliculitis. Defendants move for summary judgment, which is denied. Drawing inferences in Plaintiff's favor, a rational juror could find that Dr. Sood did not pursue an effective treatment because his employer, Wexford Health Sources, Inc., would not allow that treatment. A rational juror could find in Defendants favor, too, but that only demonstrates the existence of a disputed material fact.

1

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material]  fact."  Fed. R. Civ. P. 56(c)(B).  If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists.  Id.; Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011).  At the summary judgment stage, the evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  Id.

## Facts

On or around September 14, 2014, Plaintiff noticed "three little . . . hair bumps" around the nape of his neck, which felt sore.

(Pl.'s Dep. 15-16.)  Plaintiff showed Dr. Sood (the Medical Director) the bumps that day during Plaintiff's routine check-up at the chronic hypertension/cardiac clinic.  According to Plaintiff, Dr. Sood told Plaintiff not to worry about the bumps.  (Pl.'s Dep. 17.) The medical record from that day indicates that A & D ointment was prescribed but Plaintiff maintains in his deposition that nothing was done for him that day.  (Pl.'s Dep. 17.)  However, in his response to the summary judgment motion, Plaintiff states that he did receive A & D ointment on September 16, 2014, two days after seeing Dr. Sood. (Pl.'s Resp. ¶ 6, d/e 42, and attached Exhibits B1, B2.)

The bumps got worse, spreading, enlarging, and filling with pus.  (Pl.'s Dep. 16.)  On September 28, 2014, Plaintiff saw a nurse at sick call, who noted in the records, "from base of neck fanning up to back of head multiple fluid filled bumps, in many clusters." (9/28/14 progress note, d/e 40-4, p. 16.)  The nurse noted that there was no drainage, redness or bruising. Id.  The nurse referred Plaintiff to the doctor.

Dr. Sood saw Plaintiff the next day, on September 29, 2014. Dr. Sood diagnosed Plaintiff with folliculitis.  The parties agree that

3

folliculitis is an "inflammation of the hair follicles that can be caused by bacteria, yeast, or other types of fungus." (Defs.' Undisputed Fact 5.) The condition can range in severity from mild to severe. (Defs.' Undisputed Fact 6.)

Dr. Sood avers that he prescribed A & D ointment and a 10-day prescription for clindamycin. (De. Sood Aff. 6.) The parties agree that clindamycin is an antibiotic that can be used to treat skin infections. The parties also agree that clindamycin was a safe alternative to penicillin, to which Plaintiff is allergic. (Defs.' Undisputed Facts 11, 12.) The medical record from September 29, 2014, reflects that Dr. Sood actually prescribed Bacitracin ointment, not A & D ointment, but A & D ointment is what Plaintiff received. (9/29/14 progress note, d/e 40-4, p. 18.)

Neither the clindamycin nor the A & D ointment helped, according to Plaintiff. On November 11, 2014, a nurse examined Plaintiff, noting multiple "fluid filled blister like vesicles" at the nape of Plaintiff's neck, with some dried vesicles. (11/11/14 progress note, d/e 40-4, p. 20.) The nurse referred Plaintiff to the doctor. Dr. Sood saw Plaintiff seven days later, on November 18, 2014. Dr. Sood observed that Plaintiff had "minor razor bumps, also known as

4

pseudofolliculitis." (Dr. Sood Aff., ¶ 7.)  The difference between folliculitis and pseudofolliculitis is not clear—Dr. Sood seems to use the terms interchangeably.  In any event, Dr. Sood prescribed another round of clindamycin for 10 days.  (11/18/14 progress note, d/e 40-4, p. 21.)

Plaintiff attaches an unauthenticated document describing a condition called pseudofolliculitis barbae as "occur[ring] primarily in black males when the hair of the beard grows into an adjacent hair follicle and forms a small, curled-up mass within the follicle.  Chronic infection is present."  (d/e 42-1, p. 3.)

Dr. Sood does not address whether Plaintiff had this kind of pseudofolliculitis, but Dr. Sood does aver that pseudofolliculitis "commonly resolves itself with a change in grooming" and can be treated with topical antibiotic and anti-inflammatory creams.  (Dr. Sood Aff ¶ 5.)  The parties do not address whether or what kind of "change in grooming" might have helped Plaintiff's condition.  One medical note indicates that Plaintiff kept his hair cut short, (7/23/16 progress note, d/e 40-5, p. 22), but Plaintiff stated in his deposition that he was "always bald-headed."  (Pl.'s Dep. 16.)  A "Wikipedia" article attached to Plaintiff's response recommends that

5

hair be allowed to grow out to remedy and prevent pseudofolliculitis. (d/e 42-1, p. 1.) Whether this approach was viable for Plaintiff is not addressed. If Plaintiff is bald, then Plaintiff obviously could not let his hair grow, but the Court does not understand how, if Plaintiff is bald, Plaintiff's "hair" could become trapped in adjacent follicles. In any event, the parties do not maintain that Plaintiff's condition could have been remedied by Plaintiff letting his hair grow, so the Court assumes this as well.

Plaintiff disputes that he presented with "minor razor bumps" at the November 18 visit. Plaintiff contends that he had multiple, pus-filled clusters, "some bleeding seeping with puss and leaving areas of discharged puss on plaintiff's bedding, and shirt collars." (Pl.'s Resp., p. 3, d/e 42.) Plaintiff's cellmate from August 2014 through February 2015 avers that Plaintiff's bumps started as 3-4 bumps in August 2014 and progressed in the next month or so to bumps "nearly covering the entire back part of his head, and now there is a large scar which looks horrible." (Long Aff., ¶ 11, d/e 42-1.) The cellmate also observed some blood and puss on Plaintiff's mattress. (Long Aff., ¶¶4, 10-11.) At this stage, Plaintiff's description of the appearance of his condition governs.

The second round of clindamycin and bacitracin did not improve Plaintiff's condition, according to Plaintiff. On December 1, 2014, Plaintiff saw a nurse, who scheduled Plaintiff for a follow-up appointment with the doctor. On December 9, 2014, Dr. Sood saw Plaintiff. Dr. Sood avers that Plaintiff's pseudofolliculitis was resolving, and in order to ensure complete resolution, Dr. Sood prescribed a third round of clindamycin and some therapeutic shampoo. (Sood Aff. ¶ 8.) Plaintiff disputes Dr. Sood's description, asserting that Plaintiff's condition had actually gotten worse by December 9, not better. (Pl.'s Resp. ¶ 9.)

The next medical visit regarding Plaintiff's skin condition occurred more than two months later, on February 24, 2015. Plaintiff saw a nurse practitioner that day. The nurse practitioner took a culture and prescribed Bacitracin ointment for 10 days, with a follow-up in three days to check on the culture. (2/24/15 progress note, d/e 40-5, p. 2.) The nurse practitioner's note from 2/24/17 stated that, subjectively, Plaintiff reported that the condition had improved temporarily but was now just as bad again. The nurse practitioner's objective observations from that day were

that Plaintiff had a large area on the back of Plaintiff's head and neck with pustules. Id.

The lab results were positive for staphylococcus.[1] (2/27/15 lab report, d/e 42-2. P. 8; Pl.'s Dep. 20.) On February 27, 2015, the nurse practitioner told Plaintiff the lab results, continued the prescription for bacitracin ointment, and prescribed Bactrim for 10 days. The nurse practitioner instructed Plaintiff to apply warm, moist heat to the area and also advised Plaintiff of the risks of taking antibiotics long-term. (2/27/15 progress note, d/e 40-5.) A follow-up was scheduled for March 13, 2015.

At the follow up visit on March 13, 2015, the nurse practitioner noted "multiple dry, flat, papules" with no redness or swelling. (3/13/15 progress note, d/e 40-5, p. 5.) The note also states that Plaintiff reported improvement but still complained of itching and swelling. Id. The Bacitracin ointment was continued and Triamcinolone (a skin cream) was also prescribed. Id.

---

[1] Plaintiff asserts that the culture was taken incorrectly because none of the fluid from the pustules was retrieved. (Pl.'s Resp. ¶ 10.) The Court does not understand this objection because the culture did come back positive for staphylococcus, according to Plaintiff. Staphylococcus is "a bacterium of a genus that includes many pathogenic kinds that cause pus formation, especially in the skin and mucous membranes." Oxford Dictionaries, en.oxforddictionaries.com (last visited 2/21/18).

Two months later, on May 6, 2015, Plaintiff complained of bumps and itching to a nurse practitioner.  The medical note from this date states that Plaintiff reported that the Bactrim had helped.  The nurse practitioner objectively noted multiple dry and flat papules.  (5/6/15 progress note, d/e 40-5, p. 7.)  The nurse practitioner prescribed "coal tar shampoo," warm compresses, and a follow-up in three months.  Id. p. 8.  Plaintiff counters that at all times he had some areas that were filled with pus, though some areas may have dried.  Plaintiff submits the affidavit of his cellmate from May to October 2015—Mitchell Laabs—who observed that the back of Plaintiff's head "always seemed to be very swollen, the bumps always had puss dripping from them." (Laabs Aff. ¶ 5, d/e 42-1, p. 25.)

About four months later, on September 21, 2015, Dr. Sood saw Plaintiff at the hypertension clinic and examined Plaintiff's folliculitis.  Dr. Sood prescribed Bactrim for two weeks.  (Defs.' Undisputed Facts 28, 29.)  About six weeks later, on November 12, 2015, Plaintiff saw a nurse about his folliculitis, who referred him to the doctor.  The nurse's medical notes states that she objectively observed multiple clusters of pus-filled pockets, some open and

some scabbed over. (11/12/15 progress note, p. 13.) Plaintiff saw Dr. Sood on November 16, 2015, who prescribed more Bactrim, which Plaintiff said had helped before. (11/16/15 progress note, d/e 40-5, pp. 14-15.) Dr. Sood also prescribed Bacitracin ointment.

In a follow-up visit on December 31, 2015, an unidentified physician noted no further flare up and that the folliculitis was healing. (12/31/15 progress note, d/e 40-5, p. 16.) Plaintiff agrees that the antibiotics helped with the appearance of the problem, but he maintains that this approach did not resolve the underlying problem, which Plaintiff believes was caused by ingrown hairs that need to be freed or removed. (Pl.'s Resp. ¶¶ 19-20.)

Plaintiff next saw Dr. Sood a little over four months later, on May 5, 2016, for a recurrence of Plaintiff's folliculitis or pseudofolliculitis, and again prescribed Bactrim and a corticosteroid cream. Dr. Sood ordered a follow-up in six weeks. At the follow-up appointment on June 30, 2016, Dr. Sood continued Plaintiff's corticosteroid cream, which helped reduce Plaintiff's itching. (Pl.'s Dep. 25.) Plaintiff did not see Dr. Sood again after the June 30 visit because Dr. Sood left Hill Correctional Center.

## Analysis

The Eighth Amendment prohibits deliberate indifference to an inmate's serious medical needs. Orlowski v. Milwaukee County, 872 F.3d 417, 422 (7th Cir. 2017).

Defendants argue that Plaintiff did not have a serious medical need for the first two to three months after Plaintiff first noticed the problem. A serious medical need is one that a doctor determines needs treatment, or a need so obvious that even a layperson would recognize the need for treatment. King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012)(citation omitted). Plaintiff's problem did originally start with just three or four bumps, which Dr. Sood thought would resolve without intervention. However, Plaintiff's condition worsened fairly rapidly, requiring antibiotics about two weeks later, followed by more rounds of antibiotics, creams, and ointments. Plaintiff's own description of his condition allows an inference that the condition became severe enough to need treatment shortly after Plaintiff first noticed the bumps, and Dr. Sood himself recognized the need for treatment by the end of September 2014. A rational juror could find that Plaintiff's medical need was serious, even in its beginning stages.

The question, then, is whether a rational juror could find that Defendants were deliberately indifferent. An inference of deliberate indifference may arise if a medical professional's treatment approach is "'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" Petties v. Carter, 836 F.3d 722, 729 (7th Cir. 2016)(quoted cite omitted). A difference of opinion is not enough. Id. ("[E]vidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim.")(cite omitted).

Dr. Sood did not ignore Plaintiff's complaints and did prescribe several rounds of antibiotics, ointments, therapeutic shampoo. But an inmate "is not required to show that he was literally ignored by prison staff to demonstrate deliberate indifference." Petties v. Carter, 836 F.3d 722 (7th Cir. 2016). Knowingly persisting with ineffective treatment may arise to deliberate indifference. Petties, 836 F.3d at 729.

Plaintiff avers that the nurse who informed Plaintiff of his lab results told Plaintiff that he should be seen by a dermatologist, but "it was not going to happen, because she would have to go through Dr. Sood, and this is something he would not allow." (Langham Aff. ¶ 24.) This is hearsay—the nurse's statement cannot be considered to show that Dr. Sood in fact would not allow a referral to a dermatologist. *See* <u>Pyles v. Fahim</u>, 771 F.3d 403, 412 (7th Cir. 2014)(inmate's conversations with unnamed medical staff who told him that specialist visit/MRI would not happen because it was too expensive was "unsubstantiated hearsay assertion").

However, Plaintiff also avers that Dr. Sood told Plaintiff months after the culture, and shortly before Dr. Sood's transfer, that no treatment would work so long as Plaintiff had ingrown hairs. Plaintiff avers that Dr. Sood told Plaintiff that Dr. Sood "use[d] to be able to raise the ingrown hairs from the scalp, but his current employer [Wexford] didn't allow it, since the matter was only considered a cosmetic issue, and not a serious medical need." (Pl.'s Aff. ¶ 25; *see also* Pl.'s Dep. p. 32.)

Defendants do not explain why Dr. Sood's purported statements are not admissible against them as admissions by party

13

opponents under Federal Rule of Evidence 801(d)(2)(D). Dr. Sood was employed by Wexford, providing medical care to inmates within the scope of that employment relationship, and authorized to make statements regarding the diagnosis and treatment of medical conditions. "All that FRE 801(d)(2)(D) requires is that 'the statement be made by an individual who is an agent, that the statement be made during the period of the agency, and that the matter be within the subject matter of the agency.'" Harris v. Chicago Transit Authority, 2017 WL 4224616 *8 (N.D. Ill., not published in F.Rptr.)(occupational therapist's alleged defamatory statements about plaintiff's medical condition were admissible against therapist's employer under Rule 801(d)(2)(D) even though not specifically authorized by employer)(*quoting* Young v. James Green Mgmt., Inc., 327 F.3d 616, 622 (7th Cir. 2003)); *see also* Thomas v. Cook County Sheriff's Dept., 604 F.3d 293, 309-310 (7th Cir. 2010)(jail nurse's overheard statement that inmate was "just dope sick" admissible against Cook County under Fed. R. Evid. 801(d)(2)(D)).[2]

---

[2] In contrast, a nurse's purported statement to Plaintiff that the only course of treatment now is "laser removal surgery of some form of grafting" appears to be inadmissible hearsay if offered to prove that laser treatment or grafting is how Plaintiff's condition should be treated. The

14

Viewed in the light most favorable to Plaintiff, Dr. Sood purported statements are evidence that Dr. Sood knew the treatment he was providing was ineffective, knew that an effective treatment was available, and knew that Wexford would not authorize that effective treatment. Dr. Sood also made purported statements to Plaintiff that Wexford does not permit referrals to dermatologists for cosmetic reasons, but Plaintiff's evidence allows an inference that his scalp condition was more than just a cosmetic problem. A rational juror, even as a layperson, could conclude that chronic pustules seeping blood and pus presented a serious medical need warranting effective treatment. Inferences arise in Defendants' favor as well, but competing inferences must be resolved in the nonmovant's favor. Accordingly, summary judgment is denied.

**IT IS THEREFORE ORDERED:**

1. Defendants' motion for summary judgment is denied (d/e 40).

---

record does not support an inference that this nurse had personal knowledge or experience in treating this condition, or that treating this kind of condition was within the scope of her employment relationship with Wexford. (Pl.'s Aff. ¶ 27.)

2. A telephone status conference is set for March 16, 2018, at 11:00 a.m.  The clerk is directed to issue a telephone writ to secure Plaintiff's at the status conference.

ENTER:   February 21, 2018

FOR THE COURT:

**s/Tom Schanzle-Haskins**
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE